**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

STATE NATIONAL INSURANCE
COMPANY,
    Plaintiff,
    v.

THE COUNTY OF CAMDEN,
    Defendant/Counterclaimant.

CIV. NO. 08-5128(NLH)(AMD)

**OPINION**

**APPEARANCES:**

ROBERT J. MORROW
HUNTON & WILLIAMS LLP
200 PARK AVENUE
NEW YORK, NY 10166

WALTER J. ANDREWS
MICHAEL S. LEVINE
HUNTON & WILLIAMS LLP
1751 PINNACLE DRIVE
SUITE 1700
MCLEAN, VA 22102

    On behalf of State National Insurance Company

WILLIAM M. TAMBUSSI
JOSEPH T. CARNEY
WILLIAM F. COOK
BROWN & CONNERY, LLP
360 HADDON AVENUE
P.O. BOX 539
WESTMONT, NJ 08108

    On behalf of the County of Camden

**HILLMAN,** District Judge

    Presently before the Court are the motions of State National Insurance Company ("State National") for summary judgment on three issues:  (1) the adequacy of the County of Camden's ("County")

defense and investigation of the underlying Anderson lawsuit [543]; (2) whether the insurance contract entered into between the County and State National required State National to defend and investigate the Anderson litigation [544]; and (3) whether State National acted in bad faith or breached any duty of good faith and fair dealing owed to the County [545].[1]  For the reasons expressed below, all three motions will be denied.

## BACKGROUND

On October 20, 2008, State National filed a declaratory judgment action against the County asking this Court to declare that it is not liable to provide insurance coverage for a multi-million dollar state court judgment in favor of Nicholas Anderson. Anderson sued the County for injuries he sustained when he drove off the road and into a guardrail owned and maintained by the County.  Briefly summarized, State National contends in its

---

[1]Also pending is State National's motion to strike the County's Local Civ. R. 56.1 response and counter-statement of material facts, and for sanctions.  (Docket No. 617.)  State National argues that because the undisputed facts show that no dispute remains as to its three summary judgment motions, the County has improperly included undisputed and immaterial statements of fact to frustrate the summary judgment process. Even accepting as true State National's representation that some of the County's counter-statements are not relevant to the pending motions or are not actually in dispute -- a contention that the County vehemently denies -- it is clear that sufficient disputed facts, as related in the rest of the County's counter-statement, remain to go to the jury on the three issues presented by State National's motions.  Accordingly, the County's Local Civ. R. 56.1 response and counter-statement of material facts will not be stricken, and no sanctions will be imposed.

complaint that the County's delay in notifying it of the lawsuit, its repeated representation that the case was within the County's $300,000 self-insured retention, its errors in investigating and defending the case, and its re-valuation of the case four days into trial, breached the insurance contract's notice provision and the adequate investigation and defense condition to coverage.

The state court case reached its final resolution on November 5, 2010, with Anderson and the County reaching a settlement.[2]  Over the course of the past five years, State National's declaratory judgment action spawned numerous counterclaims, third-party and fourth-party complaints, and an intervening plaintiff complaint. At this point, all the claims between all the parties have been resolved, through motion practice or settlement, except for the certain claims between State National and the County.

State National's claims against the County include (1) a claim seeking declaratory judgment that there is no coverage for the underlying Anderson claim under State National's insurance policy

---

[2]The jury in the Anderson matter returned a verdict on October 17, 2008 in the amount of $31,295,007.57, but as a result of post-trial motions, the court entered an Order on March 10, 2009 remitting the award to $19,374,424.30. The matter was ultimately appealed to the New Jersey Superior Court, Appellate Division, which dismissed the appeal because the matter was settled while the appeal was pending.  Under the settlement, the County agreed to pay $15 million to Anderson plus twenty percent (20%) of any monetary recovery in this declaratory judgment action up to $15 million.  If the County recovers in excess of $15 million in the declaratory judgment action, the County shall pay twenty-five percent (25%) of any monetary recovery over $15 million.  (See Docket No. 609 at 7.)

with the County; (2) a claim for breach of the duty of good faith based on the County's alleged failure to settle the Anderson claim within the County's self-insured retention of $300,000; and (3) a claim for breach of the duty of good faith for the County's alleged failure to tender the self-insured retention.

The County's counterclaims against State National include (1) a claim for breach of contract of the State National Policy; (2) a claim for a declaratory judgment that there is coverage for the underlying Anderson claim under the State National Policy; and (3) a claim that State National committed bad faith with respect to its handling of the Anderson matter, thereby exposing the County to a verdict of over $20 million in excess of the State National Policy limits.

The claims between State National and the County are trial-ready, with numerous pre-trial motions pending regarding bifurcation and the adequacy and admissibility of experts and evidence.  Prior to deciding those trial-related motions and proceeding to trial, however, the Court must resolve State National's motions for summary judgment on three issues.[3]  State National seeks summary judgment on (1) whether the insurance contract entered between the County and State National required

---

[3]Pursuant to its request, State National was granted leave by this Court to file one final round of summary judgment motions because it claimed that the motions would help to streamline the triable issues in this case.  (See Docket No. 520.)

State National to defend and investigate the Anderson litigation;
(2) the adequacy of the County's defense and investigation of the
underlying Anderson lawsuit; and (3) whether State National acted
in bad faith or breached any duty of good faith and fair dealing
owed to the County.  The County has opposed the motions.  Each will
be addressed in turn.

## DISCUSSION

### A.   Subject matter jurisdiction

This Court has jurisdiction over this matter pursuant to 28
U.S.C. § 1332 because there is complete diversity of citizenship
between the parties and the amount in controversy exceeds $75,000.
State National is incorporated under the laws of the State of Texas
with its principal place of business in Fort Worth, Texas, and the
County of Camden is a governmental entity existing under the laws
of the State of New Jersey.

### B.   Summary judgment standard

Summary judgment is appropriate where the Court is satisfied
that the materials in the record, including depositions, documents,
electronically stored information, affidavits or declarations,
stipulations, admissions, or interrogatory answers, demonstrate
that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law.  Celotex
Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that

a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

C.   **Analysis**

    1.   **State National's motion on the duty to defend and investigate (Docket No. 544)**

One of the County's pending counterclaims against State National is that State National breached the parties' insurance contract.  The County claims that one element of that breach was State National's failure to provide a defense to the County in the underlying Anderson litigation, as well as State National's failure to investigate Anderson's claims.  To refute the County's position, State National contends that the language of the policy is clear and unambiguous: under the Self-Insured Retention ("SIR") Endorsement to the Commercial General Liability Coverage Form ("CGL Form") governing the $10 million policy, the County was obligated to defend itself against, and independently investigate, all claims brought against the County that implicated the insurance policy. Because the Anderson litigation triggered the policy, it was the County's sole obligation under the SIR endorsement to investigate Anderson's claims and provide a defense to those claims. Accordingly, State National argues that it cannot be held to have breached the investigation and defense terms of the insurance contract.

To specifically support its position, State National points to the County's general duties under the CGL Form, as well as the County's duties under the SIR endorsement.  Under the CGL Form, State National covenants that it "will pay those sums that the

insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies. [State National] will have the right and duty to defend any 'suit' seeking those damages. . . . [State National's] right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements" under the policy. (Docket No. 606-1 at 14.) In the event of any "occurrence, claim or suit," the County's relevant duties under the CGL Form are as follows: (1) the County must see to it that State National is notified as soon as practicable of an "occurrence," or an offense which may result in a claim, or a claim is made or "suit" brought against the County; (2) the County must cooperate with State National in the investigation, settlement, or defense of the claim or "suit"; and (3) the County will not, except at its own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without State National's consent. (Docket No. 606-1 at 20-21.)

The SIR endorsement modifies the CGL Form. (Docket No. 606-1 at 49.) The SIR endorsement provides:

1.  In consideration of the premium charged and as a condition to the issuance and continuation of the Policy, it is agreed that the NAMED INSURED shall retain, as a self-insured retention, per occurrence and as respects combined insured damages and insured allocated costs and expenses of investigation, defense, negotiation and settlement applicable to such damages, the sum of [$300,000.] The company's limit of liability, as stated elsewhere in the Policy, shall apply solely in excess of the NAMED

8

INSURED'S self-insured retention. . . .

2.  In the event that any combined insured damages and
    insured allocated costs and expenses, as
    aforementioned, exceed, per occurrence, the NAMED
    INSURED'S self-insured retention and involve the
    liability of the company, then, solely as respects
    each such occurrence, the company will pay, in
    addition to its otherwise applicable limit of
    liability [$10,000,000.00], all supplementary
    payments . . . .

4.  In the event of any occurrence which, in the opinion
    of the INSURED, is likely to give rise to liability
    under this Policy, no costs or expenses, other than
    for immediate first aid to others, shall be incurred
    by any INSURED, except at his or her own cost, peril
    and expense, without the written consent of the
    company.  The NAMED INSURED shall be obligated to

    A.  provide an adequate defense and investigation
        of any action for or notice of any actual,
        potential or alleged damages, and
    B.  accept any reasonable offer or settlement
        within the NAMED INSURED'S self-insured
        retention,

    and, in the event of any NAMED INSURED'S failure to
    comply with any part of this paragraph, the company
    shall not be liable for any damages or costs or
    expenses resulting from any such occurrence.

(Id.)

   State National contends that the SIR endorsement modifies the

CGL Form such that the SIR endorsement trumps any obligation State

National otherwise had under the CGL Form to investigate and

provide a defense for any occurrence, claim or suit.  Moreover,

State National contends that the SIR endorsement changed the $10

million policy to an excess insurance policy to the $300,000 SIR.

Consequently, State National argues that the County cannot maintain

9

any claim that State National breached the insurance contract by not providing it with a defense since the County acted as a primary insurer.

In opposition, the County first argues that the issue is moot, because State National cannot be compelled to provide a defense to an action that has already concluded. Aside from that point, the County argues that the SIR endorsement does not cause the State National policy to be "excess" to its $300,000 SIR, and that the SIR acts, in essence, as a deductible under the $10 million policy. The County also contests that the SIR endorsement modifies State National's duties under the CGL Form to provide a defense and investigation to the extent that it completely eliminates any obligation of State National to provide and pay for a defense.

The principles of insurance contract interpretation are well-settled: (1) the interpretation of an insurance contract is a question of law, (2) when interpreting an insurance contract, the basic rule is to determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a reasonable meaning to the terms, (3) when the terms of the contract are clear and unambiguous, the court must enforce the contract as it is written, and the court cannot make a better contract for parties than the one that they themselves agreed to, (4) where an ambiguity exists, it must be resolved against the insurer, (5) if the controlling language of the policy will support two meanings,

one favorable to the insurer and one favorable to the insured, the interpretation supporting coverage will be applied, but (6) an insurance policy is not ambiguous merely because two conflicting interpretations have been offered by the litigants, and a genuine ambiguity exists when the "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Simonetti v. Selective Ins. Co., 859 A.2d 694, 698 (N.J. Super. Ct. App. Div. 2004) (citations and other quotations omitted).

In this case, State National seeks to interpret the SIR endorsement to be a "primary" insurance policy provided by the County to itself, which completely eliminates any of State National's obligations to provide a defense to the County under State National's "excess" policy. In contrast, the County views the SIR as more like an insurance policy deductible that does not vitiate State National's concurrent duty to provide a defense as it contracted to under the CGL Form. The Court finds that the analysis of the language of CGL Form and the SIR endorsement, when read together, results in an interpretation that falls between the parties' two arguments.

As a primary matter, the Court finds it immaterial to the contract interpretation analysis the determination of whether the State National policy should be deemed an "excess" policy, as that

term is defined under New Jersey law,[4] or whether the SIR should be treated like a insurance policy deductible that simply changes the limit of liability under the policy by an additional $300,000.  The terminology advocated by State National and the County has no effect on the interpretation of the plain language of the insurance contract.[5]

A focus on the language of the SIR endorsement, in tandem with the CGL policy it is endorsing, shows that the County is obligated to investigate and defend any claim or suit against it, so long as the value of that claim or suit is $300,000 or under.  State National does not appear to contest that interpretation: "Where, as here, an insurance policy contains a self-insured retention, the

---

[4]To support its position that the CGL policy is "excess" insurance, State National points to the section on "Other Insurance," that provides, "This insurance is excess over any of the other insurance, whether primary, excess, contingent, or on any other basis: (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for 'your work;' (2) That is Fire insurance for premises rented to you; or (3) If the loss arises out of the maintenance or use of aircraft, 'autos,' or watercraft to the extent not subject to Exclusion g. of Coverage A."  (Docket No. 606-1, at 21.)  Although the Court will not analyze the terminology to describe the SIR endorsement advocated by the parties, this provision in the CGL form clearly does not support State National's contention that the $10 million policy can be considered "excess insurance."

[5]Accordingly, the Court will not address the parties' dispute over the persuasiveness and relevance of case law from other jurisdictions that have analyzed similar, but not identical, SIR endorsements in different contexts.  Moreover, the Court will not address the parties' dispute over the County's purported motivation in agreeing to the addition of the SIR endorsement.

policyholder is obligated to defend itself until the retention is fully exhausted." (State National Br., Docket No. 544-1 at 19.) State National, however, extends that proposition to mean that the SIR endorsement eliminates any duty by State National to investigate and defend any claim or suit brought against the County.  State National's position is not supported by the SIR endorsement.

The SIR endorsement provides that "as a condition to the issuance and continuation of the Policy," the County is responsible for the "combined insured damages and insured allocated costs and expenses of investigation, defense, negotiation and settlement applicable to such damages" up to $300,000 per claim or suit. (Docket No. 606-1 at 49.)  The SIR endorsement also provides that if the County is of the opinion that a claim or suit is "likely to give rise to liability under this Policy," no costs or expense are to be incurred by the County.  (Id.)  Plainly interpreted, this language implicates the CGL policy, and the respective duties and obligations of State National and the County under the CGL policy, including State National's "right and duty to defend any suit" up to $10 million.  (Docket No. 606-1 at 14.)  If the SIR endorsement were meant to modify or eliminate State National's investigation and defense obligations under the CGL policy, then the SIR endorsement should not only have explicitly stated that modification, but it would also not refer to the CGL policy beyond

the County's SIR.

State National appears to hang its hat on the language in the latter part of paragraph four in the SIR endorsement.

> 4.   In the event of any occurrence which, in the opinion of the INSURED, is likely to give rise to liability under this Policy, no costs or expenses, other than for immediate first aid to others, shall be incurred by any INSURED, except at his or her own cost, peril and expense, without the written consent of the company.  The *NAMED INSURED shall be obligated to*
>
> > A.   *provide an adequate defense and investigation of any action for or notice of any actual, potential or alleged damages, and*
> > B.   *accept any reasonable offer or settlement within the NAMED INSURED'S self-insured retention,*
> >
> > *and, in the event of any NAMED INSURED'S failure to comply with any part of this paragraph, the company shall not be liable for any damages or costs or expenses resulting from any such occurrence.*

(Docket No. 606-1 at 49, emphasis added.)  State National argues that regardless of the implication of the CGL policy beyond the County's $300,000 SIR, this provision places on the County the sole responsibility for the investigation and defense of any and all suits.[6]  In isolation, this provision could be interpreted as State National advocates.  But, when it is read in conjunction with the preceding sentence, as well as the other provisions in the SIR endorsement that refer to the CGL policy, State National's

---

[6]How this argument relates to State National's position on the adequacy of the County's investigation and defense is discussed in the next section.

interpretation is unavailing.

The SIR endorsement directs, clearly and unambiguously, that the County is responsible for adequately investigating and defending any occurrence, claim or suit involving bodily injury or property damage that implicates the $10 million dollar policy, but only up to $300,000 for the combined damages and allocated costs and expenses of investigation, defense, negotiation and settlement. Within that $300,000 range, the County must provide an "adequate" investigation and defense, and accept any reasonable settlement.[7] If any occurrence, claim or suit is, in the County's opinion, likely to exceed $300,000 in combined damages and costs, the CGL policy terms are implicated, including State National's duty to provide a defense to the claim or suit.  This language in the SIR appears to strike a balance between the County managing claims below $300,000, with State National protecting its interests in claims that exceed $300,000 and could rise to $10 million.

The application of this procedure under the SIR endorsement is simple for claims whose combined values for damages and costs are concretely maxed out below $300,000.  In those instances, the County assumes all responsibilities for the defense and investigation.  For claims whose combined values for damages and

---

[7]Presumably this provision was included to prevent the County from purposefully bungling an investigation or defense, or rejecting settlement offers below $300,000, so that the $10 million policy would be implicated, and the County would not have to pay any share, thus effectively eliminating the SIR.

costs concretely exceed $300,000 from the outset, the County is responsible for the investigation and defense up to $300,000, but because the $10 million policy is implicated immediately, presumably State National would wish to control the investigation and defense from the beginning.  Regardless of its decision on when to step in on the $300,000-plus claims, nothing in the SIR endorsement precludes State National from providing the investigation and defense from the beginning, even if the $300,000 is not fully realized in the end.

This case presents the not-so-simple application of the investigation and defense procedure set forth in the SIR endorsement.  The County allegedly valued the Anderson case below $300,000, but at some point it realized that the Anderson case would well exceed $300,000.  The determination of the tipping point between the County's and State National's obligation to provide an investigation and defense to the Anderson case is rife with disputed facts.  State National claims that it was not aware that the Anderson case would exceed $300,000 until it was too late for it to take charge, and that the County did not fulfill its various obligations under the policy, including providing an "adequate" defense.[8]  In contrast, the County maintains that its actions were

---

[8]When the insured's delay in providing relevant information prevents the insurer from assuming control of the defense, the insurance company is liable only for that portion of the defense costs arising after it was informed of the facts triggering the duty to defend.  <u>SL Industries, Inc. v. American Motorists Ins.</u>

more than adequate, State National was aware of the case from the
beginning, and it was State National, through its claims
administrator Meadowbrook, that refused to perform its duties to
the County by settling the Anderson case with the policy limits,
and instead fabricated a claim to deny coverage.

These disputed facts, discussed in more detail below with
regard to State National's motion for summary judgment as to the
adequacy of the County's defense, preclude the entry of summary
judgment on the issue of which party is liable for the defense
costs of the Anderson litigation.[9]  With regard to State National's
argument that, as a matter of law, it cannot be held liable for the

---

Co., 607 A.2d 1266, 1273 (N.J. 1992).  The duty to defend is
broader then the duty to indemnify.  Rosario ex rel. Rosario v.
Haywood, 799 A.2d 32, 40 (N.J. Super. Ct. App. Div. 2002)
(citation omitted).

[9]The issue of whether State National must actually defend
the Anderson litigation is obviously moot due to the final
conclusion of the Anderson case.  Relatedly, despite State
National's contention otherwise, the Court's denial of the
County's January 20, 2009 emergency motion to compel State
National to defend the County in post-trial proceedings in the
Anderson litigation cannot serve as stare decisis on the
interpretation of the insurance policy terms and which entity is
liable for defense costs.  See Bowers v. National Collegiate
Athletic Ass'n, 9 F. Supp. 2d 460, 466 (D.N.J. 1998) (citing
University of Texas v. Camenisch, 451 U.S. 390, 395 (1981))
(conclusions of law entered in connection with the injunction are
not considered the law of the case); Commodity Futures Trading
Com'n v. American Metals Exchange Corp., 991 F.2d 71, 80 (3d Cir.
1993) (finding that the district court, in considering whether
there were genuine issues of material fact in connection with the
motions for summary judgment, could not rely on credibility
findings it made in connection with granting the preliminary
injunction).

defense costs, the Court concludes that the terms of the CGL policy and the SIR endorsement are not ambiguous, and that the plain language evidences the parties' intent that (1) the County is to handle the investigation and defense of claims valued under $300,000, (2) State National is to handle the investigation and defense of claims valued over $300,000, and (3) regardless of the value of the claim, State National can step in any time to handle the investigation and defense of any claim if it will implicate the $10 million policy. Any other interpretation would render meaningless the provisions in the CGL policy regarding State National's duty to investigate and defend, and the County's reciprocal duties to cooperate.

Consequently, State National's motion for summary judgment on the duty to defend must be denied.

### 2. State National's motion as to the adequacy of the defense of the Anderson litigation (Docket No. 543)

State National argues that no disputed material facts exist as to the adequacy of the County's defense of the Anderson litigation. State National contends that it is entitled to judgment in its favor that the County's defense was not adequate, as required by the SIR endorsement, and therefore, no coverage should be afford to the County under the $10 million policy.

The County contests that it did not provide an adequate defense to the Anderson litigation, and argues that numerous disputed material facts on the adequacy of its defense preclude the

18

entry of summary judgment.  The County also argues that State National's position that State National does not have to prove prejudice or harm caused by the County's actions in defending the Anderson litigation is not supported by New Jersey law.

Noted above, paragraph 4 of the SIR endorsement contains the provision regarding the County's duty to provide an adequate defense to a claim that may implicate the $10 million policy:

> 4.   In the event of any occurrence which, in the opinion of the INSURED, is likely to give rise to liability under this Policy, no costs or expenses, other than for immediate first aid to others, shall be incurred by any INSURED, except at his or her own cost, peril and expense, without the written consent of the company.  The *NAMED INSURED shall be obligated to*
>
> > *A. provide an adequate defense and investigation of any action for or notice of any actual, potential or alleged damages, and*
> >
> > *B. accept any reasonable offer or settlement within the NAMED INSURED'S self-insured retention,*
>
> *and, in the event of any NAMED INSURED'S failure to comply with any part of this paragraph, the company shall not be liable for any damages or costs or expenses resulting from any such occurrence.*

(Docket No. 606-1 at 49, emphasis added.)

As also discussed above, the County's obligation to provide an "adequate defense" ends once a claim exceeds the SIR.  The Court has denied summary judgment on the issue of if or when the obligation to provide a defense flipped from the County to State National.  Thus, the issues that must be decided by State National's motion with regard to the adequacy of the County's

defense are (1) whether no disputed facts remain that the County's defense was inadequate during the time it was responsible for providing a defense, and (2) regardless of whether the first issue goes to a jury or is decided on summary judgment, if it is determined that the County's defense was not adequate, whether State National must show that it suffered prejudice as a result of the County's inadequate defense.

With regard to whether any disputed facts remain regarding adequacy of the defense the County provided in the Anderson litigation, the Court cannot find as a matter of law that there is no genuine issue regarding the adequacy of County's defense.[10] Previously, in the context of deciding the issue of which party must first produce its expert reports, the Court found that the "adequate defense and investigation" provision in the SIR endorsement is a condition to coverage, and the County has the burden of proving that it complied with that condition.  (Docket No. 494 at 6-7.)  State National contends that now that discovery has concluded, the undisputed evidence shows that the County cannot meet its burden of demonstrating its compliance with the adequate defense condition to coverage.

Among the allegedly undisputed inadequacies argued by State

---

[10]The Court denied State National's previous motion for summary judgment on the same issue.  (Docket No. 393 at 3 n.1.) This motion, and the Court's decision, were issued prior the undertaking of expert discovery, which has now concluded.

National are (1) the County's failure to assign a lawyer to investigate Anderson's accident and tort claim during the statutory pre-suit notice period; (2) the County's waiver of statutory design immunity in a case that turned on the County's alleged failure to maintain a County road and guide rail; (3) the County's failure to depose Anderson's causation expert, thereby subjecting the County to uncontrolled, unforeseen, and harmful testimony at trial; (4) the County's failure to designate a causation expert, commission an accident reconstruction analysis, or commission a speed analysis to develop any affirmative evidence or to rebut the opinions of Anderson's expert; and (4) the County's express waiver of the right to question Anderson about speeding before the crash, or to introduce evidence of his racing history and aspirations, in a case where excessive speed was the County's primary defense theory. (State National Br., Docket No. 543 at 9.)  State National contends that these undisputed errors, among other undisputed actions by the County, show that the County's defense of the Anderson litigation was plainly and obviously inadequate, and no jury could find in the County's favor that it provided an adequate defense.

Not surprisingly, the County proffers numerous proofs to dispute State National's contention that the County's actions were plainly and obviously inadequate.  One category of evidence that supports the County's position that its defense met the insurance policy condition that it be "adequate" is the parties' expert

discovery.  The County outlines how its expert's view of the County's defense counters State National's expert's view of the defense.  (See County Br., Docket No. 607 at 18.)  These dueling experts alone preclude the entry of summary judgment.  See Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 809 (3d Cir. 1997) (admonishing that it is for the trier of fact to determine what weight to give expert opinions, and that the trial judge must be careful not to mistake credibility questions for admissibility questions)(citing U.S. v. Velasquez, 64 F.3d 844, 848 (3d Cir. 1995) ("The axiom is well recognized: the reliability of evidence goes 'more to the weight than to the admissibility of the evidence.'").  The Court cannot independently weigh the County's actions in its defense and investigation of the Anderson case to determine whether they were "adequate" under the SIR endorsement, particularly because the insurance contract does not define what an "adequate defense" entails.  That determination is for the jury.[11]

---

[11]State National contends that the term "adequate" must be given its plain and ordinary meaning, which, according to Black's Law Dictionary, is "what is needed" and "of moderately good quality," and is "legally sufficient."  State National further contends that the Court previously found that the County must prove more than that it did not commit legal malpractice in order to demonstrate its compliance with the "adequate defense" condition in the SIR endorsement.  (State National Reply, Docket No. 613 at 6.)  The Court did not make such a specific finding, and instead observed that the "adequate defense and investigation provision does not require the County to generally opine on the adequacy of its abilities to defend and investigate all law suits against it in order to meet the condition for coverage[;] the policy requires that the County demonstrate that in handling the Anderson lawsuit, it took certain steps and made certain

The Court can decide, however, the issue of whether State National must demonstrate it was prejudiced or harmed by the County's actions.  It is clear that as a condition to coverage, the County has the burden of showing that it provided an adequate defense in the Anderson litigation.[12]  If a jury determines that

---

decisions, and that conduct was 'adequate.'"  The Court also noted, "even if the County can prove that its in-house counsel did not commit legal malpractice, it still must prove that its defense and investigation, although not considered malpractice, were adequate.  Stated differently, the condition precedent still applies even if the elements of legal malpractice cannot be met." (Docket No. 474 at 8, 8 n.1.)  What is an "adequate defense" as required by an insurance policy condition to coverage can be more burdensome than proving legal malpractice, or less burdensome, or the same.  The Court did not decide that distinction, and, in denying State National's prior motion for summary judgment on the adequacy of the County's defense, the Court suggested that "in order to prove that the County's conduct was negligent such that it caused the breach of the insurance contract provisions, the aid of expert testimony is ordinarily required."  (Docket No. 393 at 3 n.1.)  The Court leaves it to the parties' proofs, expert or otherwise, to support their respective positions on what constitutes an "adequate defense" under the insurance policy endorsement.

[12]Although the County has the burden of production to demonstrate its fulfillment of a condition precedent to coverage, State National maintains the ultimate burden of persuasion that the County should not be entitled to coverage at all.  See Cooper v. Government Emp. Ins. Co., 237 A.2d 870, 874 n.3 (N.J. 1967) ("Since in substance we are dealing with forfeitures, we believe the ultimate burden of persuasion should rest with the carrier. The burden of adducing evidence is another matter, and as to this the carrier of course does not have to speculate upon and rebut hypothetical possibilities when the insured alone is in a position to make an affirmative showing of the material facts. Thus although the carrier can offer evidence that it received no notice or the date upon which notice was first received, the insured has the burden of getting into the record whatever facts he relies upon to excuse or explain away what on the surface would appear to be a failure to comply with the policy provision. But the ultimate burden of persuasion on the total record remains

the County did not provide an adequate defense, the next question is whether that finding immediately cuts-off the County's coverage under the $10 million policy, or whether the burden then shifts to State National to prove that it was prejudiced by the County's inadequate defense in order to disclaim coverage.[13]

The County analogizes the "adequate defense and investigation" provision with other insurance policy conditions, such as the requirement for an insured to timely notify the insurer of an occurrence or suit. Under New Jersey law, even if it is found that an insured did not give timely notice of a suit to an insurer, the insurer can only disclaim coverage if it can show it was harmed by the late notice. The County contends that the same principle -- that State National must show appreciable prejudice for the County's failure to comply with a policy condition before coverage can be denied -- should apply to the "adequate defense and investigation" condition.

The Court agrees. The principle of "appreciable prejudice" were first enunciated by the New Jersey Supreme Court in <u>Cooper v. Government Emp. Ins. Co.</u>, 237 A.2d 870 (N.J. 1967). In <u>Cooper</u>, an insured instituted a declaratory judgment action against his

with the carrier.").

[13]The Court also notes that it may be determined by the jury that State National was obligated to provide a defense at some point during the litigation of the Anderson case, and if it did, the fall-out from any inadequacies of the County's defense cannot be shouldered solely by the County.

24

insurer to establish GEICO's liability to provide coverage under the policy.  The insured was involved in an automobile accident, but GEICO was not notified of the accident for almost two years because the insured believed that no claim would emerge.  GEICO disclaimed coverage because of the insured's failure to comply with the notice provision, which was considered a condition precedent to coverage.  Cooper, 237 A.2d at 872 (the policy providing that "no action shall lie against the company unless 'as a condition precedent' the insured shall have fully complied with all the terms of the policy, of which the notice provision is one").  In holding that GEICO must provide coverage to the insured, the New Jersey Supreme Court found that in order for an insurance company to escape liability, there must be proof that not only was the notice provision of its policy breached, but also that the insurer was appreciably prejudiced by that breach.  Id. at 874.  The court explained,

> [A]lthough the policy may speak of the notice provision in terms of 'condition precedent,' . . . nonetheless what is involved is a forfeiture, for the carrier seeks, on account of a breach of that provision, to deny the insured the very thing paid for.  This is not to belittle the need for notice of an accident, but rather to put the subject in perspective.  Thus viewed, it becomes unreasonable to read the provision unrealistically or to find that the carrier may forfeit the coverage, even though there is no likelihood that it was prejudiced by the breach.  To do so would be unfair to insureds.  It would also disserve the public interest, for insurance is an instrument of a social policy that the victims of negligence be compensated.

Id. at 873-74.

25

This rationale has been applied repeatedly since the Cooper decision in 1967.  See, e.g., Pfizer, Inc. v. Employers Ins. of Wausau, 712 A.2d 634, 643-44 644 (N.J. 1998) ("[U]nder traditional contract-law principles, breach of such a contractual condition would excuse the aggrieved parties' performance only if a party was actually prejudiced by the delay. . . .  The reason for the New Jersey rule is to protect the interests of policyholders because insurance contracts are contracts of adhesion and policyholders should not lose the benefits of coverage unless the delay has prejudiced the insurance company."); British Ins. Co. of Cayman v. Safety Nat. Cas., 335 F.3d 205, 213 (3d Cir. 2003) ("The New Jersey Supreme Court clearly frowns upon literal interpretation of notice provisions in situations where it results in the insured forfeiting coverage it has already paid for absent some countervailing consideration (such as prejudice) on the part of the insurer that has accepted premiums in return for offering coverage."). Moreover, even though insurance policy notice provisions are the most-often litigated conditions precedent to coverage, the appreciable prejudice standard is applied to other conditions in insurance policies.  See, e.g., Gazis v. Miller, 874 A.2d 591, 596 (N.J. Super. Ct. App. Div. 2005) ("New Jersey courts have applied the Cooper prejudice rule in various other contexts," including in cases "involving both excess insurance and reinsurance despite the fact that reinsurance agreements are not contracts of adhesion.").

26

The Cooper decision rejected prior case law that did not require that an insurer show appreciable prejudice when an insured breached a condition precedent to insurance coverage. Cf. Whittle v. Associated Indem. Corp., 33 A.2d 866, 868 (N.J. Err. & App. 1943) (finding the insurance policy notice and cooperation provisions to be conditions precedent to coverage, and that the insured breach of those provisions permitted the insurer to disclaim coverage); Ebert v. Balter, 181 A.2d 532, 535 (N.J. Super. Ct. App. Div. 1962) (holding that an insured's compliance with a condition precedent "is not tested by the presence or absence of prejudice to the insurer but only by whether the condition has been fulfilled by the insured under all the circumstances").

State National argues that the County's inability to demonstrate that it provided an adequate defense to the Anderson litigation -- in other words, that the County failed to comply with a condition precedent to coverage -- permits it to disclaim coverage without further inquiry. Putting aside the finding that the adequacy of the County's defense is a question for the jury, as well as putting aside the issue of whether State National became responsible for the defense during the course of the Anderson litigation,[14] State National's position is akin to pre-Cooper

---

[14]If State National's duty to defend under the CGL policy was implicated at some point during the Anderson litigation (as the County claims it was by its notice to State National's administrator, Meadowbrook), and State National failed to step in and take control of the defense, the County's inability to meet

cases, like Whittle v. Associated Indem. Corp., 33 A.2d 866, 868
(N.J. Err. & App. 1943), that were expressly rejected by Cooper and
its progeny.  The Court cannot find any support in the case law for
the application of the pre-Cooper cases here with regard to the
adequate defense and investigation condition precedent in the SIR
endorsement.  See Jackson v. New Jersey Indem. Ins. Co., 2011 WL
2848586, *2 (N.J. Super. App. Div. 2011) (citing Pfizer) ("New
Jersey has long required a showing of prejudice before a contract
of insurance may be avoided.").

The burden of proof of such prejudice rests on the carrier,
Cooper, 237 A.2d at 872, and in determining whether appreciable
prejudice exists, each case must turn on its own facts, Allstate
Ins. Co. v. Grillon, 251 A.2d 777 (N.J. Super. Ct. App. Div. 1969).
Thus, should a jury determine that the County did not meet the
condition precedent under the policy that it provided an adequate
defense to the Anderson litigation, State National must then
demonstrate to the jury how it was appreciably prejudiced by the
County's actions in order to disclaim coverage.[15]

---

its obligation on one insurance policy provision cannot absolve
State National's breach of a concurrent policy provision.

[15]In the context of late notice, the courts have fashioned
two variables relevant to the determination of whether there has
been appreciable prejudice: (1) whether substantial rights have
been "irretrievably lost," and (2) whether the insurer can
demonstrate that it would have had a meritorious defense had
there been timely notification.  Continental Ins. Co. v. Beecham,
Inc., 836 F. Supp. 1027, 1048 (D.N.J. 1993) (citing Morales v.
National Grange Mutual Ins. Co., 423 A.2d 325, 327-38 (N.J.

3.   **State National's motion as to the County's claim that State National acted in bad faith (Docket No. 545)**

The County claims that State National acted in bad faith in refusing to settle the Anderson case when it knew that the County was likely to suffer an excess verdict and that the case could have been resolved within the policy limits.  More specifically, the County contends that Meadowbrook,[16] State National's administrator, never issued a coverage denial, it never performed an independent coverage evaluation, it refused to engage in settlement discussions, and it failed to protect the County from an excessive verdict even though it knew the matter could be settled within the policy limits.

State National has moved for summary judgment on the County's bad faith counterclaim, and its affirmative defenses based on State National's alleged bad faith.  On the same construction of facts to support its other two motions, State National argues that no

_____

Super. Law Div. 1980)).  Presumably, if it is found that the County did not meet the policy condition of providing an adequate defense, State National's burden of demonstrating appreciable prejudice under a similar framework is not onerous.

[16]Although the County's policy is with State National, under a general agency agreement between Star Insurance Company and Meadowbrook Insurance Group, State National issued a public entity insurance policy on its "paper," but it assumed no risk under the policy.  Under the agreement, Star assumed all risk and Meadowbrook administered the claims.  All communications relating to coverage under the policy were between the County and Meadowbrook.  Star will pay any judgment in this action entered against State National.  (See County Opp. Br., Docket No. 609 at 8-9.)

disputed facts exist to refute that State National did not act in
bad faith, and that it was the County who misled State National and
did not live up to its bargain under the insurance policy.   The
County conveys a completely different version of events leading up
to the Anderson verdict, including its communications with
Meadowbrook, and Meadowbrook's actions and inactions relating to
the Anderson claim and trial.   The Court does not need to recite in
detail the parties' extensive recitation of facts to conclude that
the County's properly supported opposition to State National's
summary judgment motion demonstrates the existence of material
disputed facts on the issue of bad faith.   Consequently, the Court
cannot enter judgment in State National's favor on this claim.

State National's motion, however, raises an issue of law that
the Court must decide.   State National argues that its actions
should be viewed under the "fairly debatable" standard, which
requires a finding that the insurer had no debatable basis to deny
coverage, and that the insurer acted with reckless disregard to the
facts and proof submitted by the insured.   See Pickett v. Lloyd's,
621 A.2d 445, 454 (N.J. 1993).   The County counters that the
"fairly debatable" standard does not apply to this case because
that standard is employed in cases involving first-party claims --
that is, in cases where an insured claims that the insurer acted in
bad faith in paying a claim out to the insured.   The County
contends that the "fairly debatable" standards is inapplicable to

30

cases such as this one, where the insured claims that the insurer acted in bad faith in its duties to settle a third-party claim. See Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 323 A.2d 495, 497-98 (N.J. 1974).

The Court finds that the "fairly debatable" standard does not apply to the analysis of the County's bad faith claim in this case. Even though no bright-line rule has been established in the case law as to whether the "fairly debatable" standard only applies to first-party claims, and there is no specific case that precludes the application of that standard here,[17] the Court finds that the

---

[17]State National cites to this Court's decision in Evanston Ins. Co. v. Crocilla, 2012 WL 6707754 (D.N.J. 2012) to support the proposition that the "fairly debatable" standard is applicable in cases involving the insured's claim that the insurer acted in bad faith in settling a third-party claim.  In Evanston, the insurance company instituted a declaratory judgment action seeking a declaration that it did not have a duty to defend or indemnify the insured.  The insured cross-claimed for bad faith, claiming that the insurer's refusal to accept her tender in a state court action and the denial of her claim for defense and indemnification were done in bad faith.  After finding that the insurance policy did not afford the insured any coverage for the claims advanced against her in the underlying state court proceeding, this Court then briefly addressed the insured's bad faith claim.  This Court cited a Third Circuit case, which cited Pickett v. Lloyd's, 621 A.2d 445, 454 (N.J.1993), for the basic standard under New Jersey law for determining whether an insurer has acted in bad faith, without marking any distinction between first-party or third-party claims.  This Court did not specifically analyze the insured's claim under the bad faith standard cited, but instead summarily denied the insured's bad faith claim because of the Court's finding that she was not entitled to a defense or investigation under the policy.  The Court does not find its decision in Evanston to substantively support State National's position that the "fairly debatable" standard is definitively applied in the third-party context.  Cf. Pickett, 621 A.2d at 454 (citation

rationale of Rova Farms is more applicable to this action than the rationale of Pickett.

In Pickett, the New Jersey Supreme Court began its opinion by explaining Rova Farms:

> In Rova Farms Resort, Inc. v. Investors Insurance Co., 65 N.J. 474, 323 A.2d 495 (1974), this Court held that an insured may recover more than the policy limit for a liability insurer's bad-faith refusal to settle a third-party claim against its insured within that limit, when the refusal results in the third party obtaining a judgment against the insured that exceeds the policy limit. The Court emphasized that by virtue of the terms of a liability policy that prevented the insured from settling on its own behalf except at its own expense, the carrier had made itself the agent of the insured in this respect. "Thus the relationship of the company to its insured regarding settlement is one of inherent fiduciary obligation." A necessary corollary of that fiduciary duty to act on behalf of the insured is that a decision not to settle within the policy limits must be an honest one. It must result from a weighing of probabilities in a fair manner. To be a good faith decision, it must be an honest and intelligent one in the light of the company's expertise in the field. Where reasonable and probable cause appears for rejecting a settlement offer and for defending the damage action, the good faith of the insurer will be vindicated.

Pickett v. Lloyd's, 621 A.2d 445, 449-50 (N.J. 1993) (internal citations omitted).[18]

_____

omitted) ("Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim.").

[18]See also Wood v. New Jersey Mfrs. Ins. Co., 21 A.3d 1131, 1139-40 (N.J. 2011) (explaining that a Rova Farms bad faith claim is a "simple breach of contract claim"--a "cause of action against an insurer in those instances where certain circumstances coalesce: where there is a settlement demand within the policy

The <u>Pickett</u> court then noted, "This case involves what is called a 'first-party' claim against an insurance company: a suit by an insured against his insurance company because of its failure to settle his claim, as opposed to a suit based on the insurer's failure to settle a third party tort claim for a reasonable sum." <u>Id.</u> at 450 (quotations and citation omitted).   The court concluded, "We are satisfied that there is a sufficient basis in law to find that an insurance company owes a duty of good faith to its insured in processing a first-party claim."   <u>Id.</u>   To analyze a bad faith claim in this context, the court adopted the "balanced approach" from Rhode Island:  "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." <u>Id.</u>

The Third Circuit has also noted the distinction between <u>Pickett</u> cases and <u>Rova Farms</u> cases.  In <u>American Hardware Mut. Ins. Co. v. Harley Davidson of Trenton, Inc.</u>, 124 Fed. Appx. 107, 112 (3d Cir. 2005), the court upheld the district court's application of <u>Rova Farms</u> to an insured's claim that the insurer did not settle a tort claim against the insured in good faith.  In rejecting the

limits, the insurer in bad faith refuses to settle the claim, and the verdict above the policy limits is returned. In that defined setting, the carrier's bad faith failure to settle the claim within the policy limits may render the carrier liable for the entire judgment, including the excess above the policy limits").

insurance company's argument that the district court should have
employed the <u>Pickett</u> "fairly debatable" standard, the court found
that although the issue of whether the insured would be held liable
for the third-party plaintiff's injuries was "fairly debatable,"

> in the context of a third-party claim with a possibility
> of an excess verdict, <u>Pickett</u> supplies only part of the
> equation.  The 'fairly debatable' standard is analogous
> to the probability liability will attach in a third-party
> claim, but it does not consider the likelihood of an
> excess verdict.  A third-party claim that may exceed the
> policy limit creates a conflict of interest in that the
> limit can embolden the insurer to contest liability while
> the insured is indifferent to any settlement within the
> limit.  This conflict is not implicated when the insured
> is a first-party beneficiary, where the claimant and the
> insurer are in an adversarial posture and the possibility
> of an excess verdict is absent.  <u>Rova Farms</u>, not <u>Pickett</u>,
> protects insureds who are relegated to the sidelines in
> third-party litigation from the danger that insurers will
> not internalize the full expected value of a claim due to
> a policy cap.

<u>American Hardware</u>, 124 Fed. Appx. at 112.

According to the County, Meadowbrook refused to perform an
independent analysis of the Anderson case or participate in
preparing for trial, and after the trial was underway, it refused
to participate in settlement talks with Anderson's counsel, even
though Anderson's demand was $10 million, and the trial judge had
recommended settlement in the $6 million - $8 million range, both
within policy limits.  Additionally, the County points out that an
attorney hired by Meadowbrook to observe the second-to-last day of
trial reported that a jury verdict potential was in the $10 million
to $15 million range, that a reasonable settlement value was $4

million, and that there was a small window to settle the case the
next day before the jury returned its verdict.  The County contends
that despite knowing this, Meadowbrook instead focused on
supporting its case to disclaim coverage under the policy based on
the County's alleged breach of the adequate defense provision.

To refute that these claims warrant the Rova Farms analysis,
State National argues that because (1) the County maintained full
control over the defense of the Anderson litigation, (2) State
National was relegated to the sidelines, (3) State National denied
coverage on the last day of trial just before the jury returned its
verdict, and (4) the County had the ability to settle the case
itself, Pickett is applicable.

If this case fit without dispute into that description, then
perhaps Pickett would apply.  As articulated above, however,
dispute remains as to State National's duty to provide a defense to
the Anderson litigation, and as to whether the County's "full
control" of the litigation was by virtue of its choice or necessity
due to Meadowbrook's alleged refusal to get involved.  Dispute also
remains as to the County's ability to settle the matter on its own
without input from State National, particularly when any proposed
settlement would exceed the County's SIR and implicate duties and
obligations in the CGL policy.

Viewing the evidence of Meadowbrook's actions during the
pendency of the Anderson claim and trial in the light most

35

favorable to the non-moving party, the County, it could be found by a jury that Meadowbrook did not "diligently seek a possible settlement to protect the larger interest of its insured," Rova Farms, 323 A.2d at 505, and instead focused on its own interest in its attempt to pay nothing by disclaiming coverage instead of the $10 million policy limit.  Thus, this case is different from the Pickett determination of whether State National had a reasonable basis for denying the County's claim for defense and coverage under the $10 million policy, and it is instead more analogous to the Rova Farms analysis.

Under the Rova Farms standard, it is the County's burden to establish bad faith on the part of the State National.[19]

---

[19]Rova Farms sets forth the standards for evaluating whether the insurer acted in good faith:

> "[A] decision not to settle must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the [insurance] company." This expertise must be applied, in a given case, to a consideration of all the factors bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

Courvoisier v. Harley Davidson of Trenton, Inc., 742 A.2d 542, 548 (N.J. 1999) (quoting Rova Farms).

<u>Courvoisier v. Harley Davidson of Trenton, Inc.</u>, 742 A.2d 542, 548 (N.J. 1999).  In its opposition to State National's motion on its bad faith claim, the County has presented sufficient evidence to show that a genuine issue remains as to State National's actions relating to its involvement in the Anderson matter.  Consequently, State National's motion for summary judgment on the County's bad faith counterclaim must be denied.

<b><u>CONCLUSION</u></b>

State National's three motions for summary judgment, as well as its motion to strike the County's Local Civil Rule 56.1 statement, are denied.  The conclusions of law determined herein relating to the interpretation of the insurance policy and the County's bad faith counterclaim shall govern the claims going forward.  The case shall be set for trial, with pre-trial hearings scheduled accordingly to address the parties' pending trial-related motions.  An appropriate Order will be entered.


Date:____03/31/14_____          ____S/NLH_____
At Camden, New Jersey                NOEL L. HILLMAN, U.S.D.J.